827 A.2d 1129

SCULLY–BOZARTH POST # 1817 OF THE VETERANS OF FOREIGN WARS OF THE UNITED STATES, PLAINTIFF–CROSS–APPELLANT, v. PLANNING BOARD OF THE CITY OF BURLINGTON, DEFENDANT–CROSS–RESPONDENT.

MITCHELL AND SAMUELLA COHEN, KARL LAUER AND JEAN LAUER, JACK AND DIANE BLACKEBY, PAUL AND TINA FITZPATRICK, HELENE HALL AND JACK JERECHKO, PLAINTIFFS–APPELLANTS, v. SCULLY–BOZARTH POST 1817 VFW, A NONPROFIT ORGANIZATION, BURLINGTON CITY PLANNING BOARD, A MUNICIPAL ENTITY, DEFENDANTS–RESPONDENTS, AND MATTHEW WISNIEWSKI, ZONING OFFICER OF THE CITY OF BURLINGTON, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Telephonically argued May 13, 2003—Decided July 21, 2003.

Before Judges KING, WEFING and LISA.

*Christopher Norman,* argued the cause for appellants Mitchell and Sameulla Cohen, et al (*Norman & Kingsbury,* attorneys; *Mr. Norman,* on the brief).

*Joseph M. Pinto,* argued the cause for respondent/cross-appellant Scully–Bozarth Post # 1817 VFW (*Polino and Pinto,* attorneys; *Mr. Pinto,* on the brief).

*Frederick W. Hardt,* argued the cause for respondent/cross-respondent Planning Board of the City of Burlington.

The opinion of the court was delivered by

LISA, J.A.D.

In this land use dispute, the Burlington City Planning Board (Board) denied the application of Scully–Bozarth Post # 1817 of the Veterans of Foreign Wars of the United States (VFW) to expand a pre-existing nonconforming use by placing a surplus army tank on the property containing its gathering hall. The property is located in an R–1 zoning district, and in the City's

Historic District. The tank would be permanently placed on the property as a memorial to veterans of the armed forces.

A number of neighboring residents (objectors) opposed the variance at the proceedings before the Board. Ten of those individuals, living in six homes near the VFW's property, participated in the trial court proceedings by virtue of a separate action they filed against the Board and the VFW. Their action was consolidated with that filed by the VFW against the Board, seeking to overturn the denial of its variance application.

The trial judge granted summary judgment in favor of the VFW, reversing the Board's action. The judge found the Board's action improper because it was taken without prior discussion or deliberation and because it was unsupported by the record. The order directed the Board to grant the use variance application and conduct further hearings to consider site plan review, with or without conditions. The order also denied the objectors' summary judgment motion, which sought to dismiss the VFW's action, to order removal of the tank (which had been placed there as a result of prior proceedings, which we will discuss below), and to allow the objectors to dismiss their remaining claims. The Board did not file any pleadings or participate in the trial court proceedings. Before us, the Board has not participated, except to inform us it relies on the position of the objectors.

The objectors appeal, arguing (1) the Board's denial of the VFW's use variance application is supported by the record, (2) the Board's resolution was properly adopted and memorialized and it represented the Board's collective decision, and (3) the Board properly denied the VFW's request for reconsideration. The VFW cross-appeals, arguing (1) the trial court erred in allowing the objectors to participate because they did not file a proper intervention motion, and (2) in the event we reverse the summary judgment motion in favor of the VFW, we should remand the matter to the trial court or the Board for further proceedings. We agree with the objectors and reverse on the appeal. We affirm on the cross-appeal.

## I

The VFW property is located at 142 Riverbank.[1] The lot contains a building owned and used by the VFW as a gathering hall since 1937.[2] The building was originally built in the nineteenth century as a three-story mansion. In 1964, the upper stories were in a poor state of repair and were removed. The building is now a one-story masonry building, nineteen feet high. It is open daily for various activities, including bingo once a week. The lot is about 338 feet by 203 feet, consisting of about 1.6 acres. The property is in the R–1 zoning district, Burlington City's highest residential district. It is also within the city's Historic District. Because the VFW's use predated the city's zoning ordinances, it enjoys the status of a pre-existing nonconforming use. Only single family detached dwellings are a permitted use in the R–1 district. Conditional uses permitted are schools and places of worship.

The property is bordered by the Delaware River to the north. Between the property and the river is Delaware Street and a public promenade along the river. The building sits back 123.5 feet from the street. The VFW building, along with others in proximity to it, is somewhat elevated above the street and promenade, with a large expanse of lawn. A number of eighteenth and nineteenth century mansions are located in this immediate area. There are also other nonconforming uses, including the Catholic Welfare office building immediately to the east of the VFW building and a three-story building housing three or four apartments immediately to its west. Beyond the apartment building, there are four homes, and then Saint Mary's School. Some

---

[1] According to the Board's resolution, the property is also known as 160 Riverbank.

[2] The Board's resolution states it has been used in this manner since 1930. The record shows, however, that the VFW has been in existence in Burlington City since 1930, but at this location since 1937.

distance beyond the school is the Burlington–Bristol Bridge, crossing into Pennsylvania.

The proposed location of the tank is in front of the gathering hall, facing the river. The application sought approval for the placement of the tank on a concrete pad measuring sixteen feet by thirty feet. The memorial would include five flag poles, each commemorating one of the military branches. There would also be lighting, to illuminate the tank at night, and landscaping. The tank, would be "demilitarized," by removing its machine guns, rendering the tracks immovable, removing the engine and welding shut the hatches. In its demilitarized state, it would measure ten feet high, thirty feet long and fifteen feet wide. It would weigh fifty-two tons.

## II

At the time of the variance application, in the Fall of 2001, that is the subject of this appeal, the concrete pad and tank had already been in place for about two years as a result of earlier proceedings. This appeal marks the second occasion on which this court has considered this case. We review the prior history.

On April 12, 1999, the VFW applied to the Board seeking "Sketch Plan Review" and "Final Site Plan Review" for placement of the tank. The Board conducted hearings and considered evidence in favor of and opposed to the proposal. The objectors now before us voiced their opposition then. The Board concluded the application satisfied the criteria for a minor site plan, was an accessory use, and did not require a use variance. The Board approved the application on that basis. The objectors[3] filed an action in lieu of prerogative writs against the VFW and the Board. The Law Division judge reversed, finding that the Board's action was jurisdictionally deficient and the tank memorial was not an accessory use. The tank had already been installed. The judge's

---

[3] The twelve objectors who sued in that case include the ten individuals who sued in this case, plus two others.

final order, entered March 7, 2000, required removal of the tank unless within forty-five days the VFW either appealed or filed a new application to the Board, in which case the removal requirement would be stayed. The VFW appealed, and the tank remained.

On May 21, 2001, a panel of this court affirmed in an unpublished opinion. *Cohen v. Scully–Bozarth Post 1817 VFW* (A–3858–99T1). We determined that installation of the tank memorial constituted an expansion of a nonconforming use and required a use variance under *N.J.S.A.* 40:55D–70d(2). We continued the stay, conditioned upon the filing within thirty days of an application to expand the nonconforming use. The VFW timely filed its application.

The Board conducted hearings on October 24, 2001 and December 19, 2001. The Board considered the transcribed testimony and other evidence from the earlier hearings. It viewed videotapes of the VFW property and surrounding neighborhood. The Board members had the opportunity to see the tank in position and thus view first-hand its appearance and relation to the surrounding area. The objectors and the VFW were represented by counsel. A number of neighboring property owners spoke in opposition, complaining that the circa–1970 tank, by its nature, was not appropriate in this historic eighteenth and nineteenth century setting. They did not contend that some form of memorial would not be appropriate on the VFW property; they contended that any such memorial should be in conformity with the historic characteristics of the neighborhood. The objectors also complained that the tank is stark and ugly. A number of city residents spoke in favor of the tank memorial as an appropriate commemoration of Burlington residents who died in service to our country and to those who serve in the military. These individuals felt the location on the VFW property was appropriate and did not adversely affect the neighborhood.

The objectors presented the transcribed expert testimony of Edward E. Fox, III and his written reports from the 1999

proceedings and the live testimony of Thomas A. Scangarello, both professional planners with extensive experience. Fox is the consultant to the city's Historic Preservation Commission (Commission). He issued his original ten-page report on April 30, 1999 and a nine-page revised report on May 13, 1999. The purpose of his reports was to comment to the Board, on behalf of the Commission on "how the proposed undertaking would affect an historic site or architectural significance." Under the city's Land Use Ordinance, the planning and zoning boards are required to submit applications for development within the Historic District, such as the use variance involved here, to the Commission for review and comment.

Fox issued his initial report before the Commission met. The revised report came after the Commission met on May 5, 1999. Any differences are accounted for by input from the Commission members and discussion of the matter at the Commission meeting. The Board relied on the revised report, constituting the official comment of the Commission.

Fox analyzed the site and its relationship to its surroundings. He noted the VFW property is an historical site within a local, state and national register historical district, listed as a contributing property. The Commission declined to issue a certificate of appropriateness for the tank memorial. At its May 5, 1999 meeting, the Commission voted to recommend that the Board deny the VFW's application because, under the criteria of the Historic Preservation Ordinance, it would adversely affect the historic district.

According to Fox, the tank memorial failed to satisfy four of the five criteria in the ordinance for a certificate of appropriateness:

(1) The impact on the historic or architectural significance of the site or the historic district: The tank "would be clearly, visually disruptive to any person viewing the properties along historic Riverbank Drive." It "is anachronistic and disruptive to Burlington City's historic Nineteenth Century riverfront architectural character and is incompatible in terms of setback, height,

massing, and other key historic streetscape elements regulated by the ordinance."

(2) The site's importance to the city and the extent to which its historic or architectural interest would be adversely affected to the detriment of the public interest: Even after the 1964 alteration of the VFW building, it continues to maintain "a pattern of massing, rhythm, setback, materials, and street/river presence that is in context with other buildings in the historic district and along the river." Further, the building's setback and riverfront lawn are historic landscape elements and were noted as key features in the National Register nomination. Maintaining these features is in the public interest, which would be violated "by parking the tank in the forefront of the property without regard to the historic building or its historic landscape."

(3) The extent to which the proposed action would adversely affect the public's view of an historic site within an historic district from a public street: The main criticism here is that the tank, because of its mass, if there at all, should be behind the building line. From the street, "[t]he tank appears almost as tall as the building itself."

(4) The impact on the historic district's architectural or historic significance and the structure's visual compatibility with the buildings, places and structures to which it would be visually related: Under this criterion, the size, nature and location of the tank adversely impact on the architectural and landscape character of the VFW property and adjacent properties. It is visually incompatible with these properties. These properties "are architecturally and historically significant for Burlington's Eighteenth and Nineteenth Century historic periods. Therefore, the ordinance's requirements imply that a Nineteenth Century-style memorial, or one compatible with that period's architecture or landscape architecture, would be appropriate for this location."

The fifth criteria, the use of any structure involved, was not deemed by the Commission to be violated, because it would be reasonable for the VFW to have some type of memorial on its

property honoring members of the military who defended our country. Therefore, the Commission did not object to a memorial per se. The conclusion of Fox's final report, submitted on the Commission's behalf, states: "It does appear that a war memorial may be appropriate upon this property, if it were designed and located within a historically and architecturally compatible context."

This analysis was consistent with Fox's 1999 testimony before the Board that we summarized in our previous opinion:

> The Commission reviewed the application and determined that it failed to meet four of the five criteria necessary for issuance of a "certificate of appropriateness." The Commission concluded that the tank would be "inappropriate and disharmonious ... out of time and out of place with the other properties on Riverview (sic) Avenue," which included "a line of very historic mansions and properties designed by some of the best and noted architects of the Philadelphia area of the 19th century;" would adversely impact one of the key features of the area, which was the large lawns and landscapes of the nearby properties; would "actually be a step backwards in terms of historic preservation"; "would undoubtedly not be visually related and be incompatible with the other properties in the district"; and that, although a memorial is an appropriate use for a VFW post, the tank, fencing and flags were not an appropriate use.

Scangarello agreed with Fox's findings and conclusions. He agreed that some form of memorial would be appropriate, but not a tank. He suggested something "softer, more in keeping with the character of that neighborhood." He contrasted this with "the tank [which] is a very large object in the front lawn of an area that's surrounded by very historic mansions."

The evidence established that, with landscape screening, the tank is not extensively visible from the sides. The consensus of the witnesses was that it could be seen for a stretch of only about 800 feet along the riverbank. Scangarello was asked whether the visual impact was thus minimized. He replied: "Well, the goal is to put a tank on the front lawn so everybody can recognize it, look at it, see it, visit it and say this is a symbol of what—of what we are and what we stand for. In answer to your question, it's not a minimal impact. It's being put there to have an impact."

When asked specifically by the VFW's attorney whether landscape screening could minimize the visual impact, Scangarello remained steadfast in his opinion: "[I]t would be difficult to screen or buffer something that large and impressive as a tank." He reviewed the proposed landscape plan and stated the visual impact is not minimal "because it's—there are times when you look beyond the physical, what's there, and ... you kind of look at the psychological and you know there's—and you know it's there."

We view this testimony as clearly indicating that the visual impact is not minimal. Because of the size and location of the tank, it is meant to be seen and is seen by anyone passing by. That it is visible for only about an 800-foot stretch does not diminish its visibility or impact. It is still seen in a clear and unobstructed fashion throughout that stretch. Because of its imposing nature, the tank leaves a strong and lasting psychological impression. We disagree with the trial judge's assessment of this testimony that Scangarello found the visual impact minimal. What is more important, however, is not the interpretation of the testimony by the trial judge or by us, but whether Board members could reasonably interpret it one way or the other. We will discuss this later.

The VFW presented the expert testimony of a highly qualified planner, Marc R. Shuster. He served as Burlington City's planner from 1973 to 1982, and during his tenure drafted the original Historic District Ordinance and advised the first Historic Commission for three years. He acknowledged that the introduction or expansion of any nonconforming use would cause some detriment to the public good and some impairment of the zone plan and zoning ordinance. In his opinion, however, any such detriment and impairment caused by the tank monument would be minimal. He stated: "It takes up 480 square feet ... [or] .07 percent of that total 1.66 acre site, in a location where the impact and visibility is minimal."

Contrary to Scangarello's testimony that no special reasons existed to support the variance to expand a nonconforming use,

Shuster opined that special reasons exist because the tank memorial is inherently beneficial and because the VFW site is particularly suited for the memorial. He premised the former reason on the purposes of veterans' organizations as chartered by Congress, namely "fraternal, patriotic, historical and educational." Because the tank memorial would advance those purposes, he reasoned it is inherently beneficial. The VFW expressly declined to assert this theory before the trial court and has not asserted it before us. Shuster based the latter reason on the proximity to the long-existing location of the VFW building: "what more appropriate location for this monument than on this site, next to the VFW Charter to receive such a boon." In his opinion, the monument would promote the general welfare.

Shuster discounted the Commission's negative report. He characterized the tank as an "artifact," notwithstanding its modern vintage, "that represents the history of this nation and the state and the community because there are those in this community who did serve as veterans of foreign wars." He concluded this artifact fulfills the goals and purposes of the Historic District in an appropriate manner and in an appropriate location. He pointed out that a purpose of the Historic District is "to pursue the past by making it compatible and relevant to the present to enhance interest in the City. To do this by exemplifying the broad cultural, political, economic or social history of the nation, state or community."

At the December 19, 2001 meeting, after the presentation of all of the testimony and the closing statements of both attorneys, a motion was made and seconded to approve the variance. Without discussion, a roll call vote was taken. Four members voted in favor and three against. Because a use variance requires at least five affirmative votes for passage, *N.J.S.A.* 40:55D–70d, the variance application was denied. We note that at the October 24, 2001 hearing, when the attorney for the VFW informed the Board that he was unexpectedly unprepared to present his intended expert witness that evening and would need an adjourned date to com-

plete his presentation, the Board informed him that one member would be out of town for the November monthly meeting. This would mean that the VFW would need to garner five out of only six possible votes. To give the VFW a full opportunity to obtain the five votes needed, the Board accommodated the VFW by agreeing to carry the matter until the December meeting, when all seven members would be present.

At the January 23, 2002 meeting, a memorializing resolution was presented for consideration. The Board's attorney prepared it in advance of the meeting, apparently without consultation with those who would vote on it, namely the three members who voted against the application. The Board's attorney sent copies of the proposed resolution to the attorneys for the VFW and the objectors in advance of the meeting. At oral argument, the Board's attorney informed us it is his customary practice to send a copy to the clerk of the Board for advance distribution to the members of the Board. He believed he did so in this case, but it is undisputed that copies were never furnished to any Board members prior to the meeting.

The VFW matter was the first item on the agenda for the January 23, 2002 meeting. When it was determined that the members had not previously received the proposed resolution, however, the matter was held until the end of the meeting. The three members were furnished with a copy at the beginning, and over the next two to three hours, while the Board considered other agenda items and during at least one break between other items of business, the three members read the proposed resolution. When all other business was concluded, the Board returned to the VFW matter at about 10:45 p.m. At that time, without discussion, the three members who had voted to deny the application voted to adopt the memorializing resolution.

Meanwhile, on December 21, 2001, the VFW filed with the Board an application for reconsideration of the denial of its variance application. The sole basis for the application was the failure of the Board members to have any discussion prior to

voting at the December 19, 2001 meeting. The application requested that the Board members have such a discussion at the January 23, 2002 meeting and re-vote on the variance application. The Board declined to do so at the January 24, 2002 meeting, deeming any reconsideration application premature until the resolution was adopted.

After the vote on the resolution, it was agreed the reconsideration application would be carried until a later meeting. It was noted that two members who had voted in favor of the variance application were no longer members of the Board,[4] and time would be needed to fill their vacancies and to allow their replacements to read the record. At its March 27, 2002 meeting, the Board, after considerable discussion, denied reconsideration. The vote was five to two, with the two new members joining the three who had previously voted against the variance application to constitute the majority.

In the ensuing litigation, after hearing cross-motions for summary judgment, the trial judge issued a written opinion. He found that the absence of discussion, debate and deliberation by the Board members before voting on the variance application at the December 19, 2001 meeting constituted a fatal defect in the Board's proceedings. He felt the memorializing resolution was purely the product of the Board's attorney and the record did not reflect why any Board member voted as he or she did. The judge stated that a remand for an expression of findings would not be feasible so long after the initial Board decision. The judge concluded: "It is for these reasons that I feel compelled to take the rather bold and somewhat unusual step of analyzing the evidence and concluding whether the board properly rejected the application for a d variance."

The judge then evaluated the evidence in the record before the Board. He made credibility findings, favoring the testimony of

---

[4] It appears that one member resigned in protest over the outcome of the VFW application and the other resigned because he moved to another municipality.

Shuster and other VFW witnesses over that of Fox and Scangarello. He concluded that the VFW carried its burden of proving the positive and negative criteria required for approval of the variance: "I am satisfied that the tank at its location on the VFW property promotes the public morals and welfare, *N.J.S.A.* 40:55D–2a, while impacting with minimal, rather than substantial detriment to the Historic District and the neighborhood generally. *N.J.S.A.* 40:55D–2i."

The judge ordered the Board to grant the use variance. Because of his disposition, he found it unnecessary to consider the VFW's argument that it was improperly denied the reconsideration it sought before the Board. This appeal followed.

### III

We analyze the procedural issues—the vote without discussion on December 19, 2001 and the circumstances of the adoption of the memorializing resolution on January 23, 2002—in conjunction with the reconsideration proceedings before the Board on March 27, 2002. In the context of this case, the issues are interrelated.

*N.J.S.A.* 40:55D–10g provides that "The municipal agency shall include findings of fact and conclusions based thereon in each decision on any application for development and shall reduce the decision to writing." The VFW argues that this provision mandates a two-step procedure. First, each member of the municipal agency must verbally express his or her findings of fact and conclusions. Further, the members must discuss and debate the matter, so each can have the opportunity to consider the views of the others before reaching a final conclusion. In other words, they must deliberate. All of this, according to the VFW, must be done in the course of the public meeting. The second step is for the agency's attorney to prepare a resolution reciting those findings and conclusions. The trial judge agreed. We do not.

The above rationale is flawed because the next sentence of *N.J.S.A.* 40:55D:10g provides that "The municipal agency shall

provide the findings and conclusions through: ... (2) A memorializing resolution...." Read together, these provisions establish that it is the resolution that "provides" the required findings of fact and conclusions. There is no mandatory two-step procedure.

We do not mean to suggest that discussion among board members is inappropriate. They are public officials, entrusted with the responsibility of deciding issues affecting the public. Discussion by board members in the public forum is beneficial. We do not deem it mandatory. Individual members do not act. The board acts as a body. The resolution provides the body's findings and conclusions, expressed by those who vote to adopt the resolution. This rationale is conditioned, of course, on the premise that those who vote to adopt have read the resolution, understand it and agree with its contents. Every presumption should be indulged that those conditions have been met. The burden is on the opponent to show otherwise.

The attorney's function is to draft a proposed resolution, acting as a scrivener for the board. This is only a proposed statement of findings and conclusions. The proposed resolution should be furnished to the board members in advance of the time they will vote, to provide them ample time to study it and, if they deem it appropriate, request clarifications or modifications. Cox, *New Jersey Zoning and Land Use Administration*, § 28–5.1 at 628–30 (Gann 2003).[5] "Sometimes several drafts are required in order to give complete and accurate expression of the intent of the board." *Id.* at 629. Whether the final version of the resolution, as adopted, differs from any comments publicly made by one or more members voting on it, or whether one or more members did not publicly comment at all, does not detract from the resolution's

---

[5] At the time of the Law Division decision in 1992, the trial judge reviewed and was critical of this section in the 1991 edition of Mr. Cox's treatise. That version differed from the current version, which now includes discussion making clear that, although the proposed resolution is drafted by the attorney, the final resolution must reflect the members' determinations, after their review and modifications, if requested.

status as the official statement of the board's findings and conclusions.

■ Applying these principles to this case, a legitimate question arises whether the three members who voted to adopt the resolution on January 23, 2002 had ample opportunity to study the draft during their meeting that evening. They did not acknowledge on the record that they read it, understood it and agreed with it as drafted. In our view, however, that question was answered on March 27, 2002, when the Board entertained the VFW's reconsideration motion. The three members participated in a full discussion of the matter and expressed their reasons for voting against the variance.

When a motion was made, following all of the discussion, "to not alter the prior decision of the board," those three members (joined by the two new members who had reviewed the record) voted in favor. By this time, more than two months had passed since they received the resolution and voted on it. They adhered to their prior position. We are satisfied that any possible deficiency that might have occurred on January 23, 2002 was rectified on March 27, 2002.

If there was any perceived deficiency in the process by which the Board members obtained and reviewed the proposed resolution before voting on it, the appropriate remedy would be for the court to remand the matter to the Board, not to divest the Board of its authority to carry out its functions. As stated, under the circumstances of this case, we need not determine whether a threshold showing justifying a remand was made. In essence, the further consideration that would be given at a remand proceeding was given at the reconsideration proceeding.

## IV

■ We have concluded that the resolution was properly adopted and the trial judge erred by taking the case away from the Board and deciding it himself. The resolution must rise or fall

on its merits. The role of a court in reviewing the decision of a local board's land use decision is very narrowly circumscribed. Courts must give substantial deference to such decisions, recognizing that because of the knowledge possessed by local board members of local conditions and interests, they are best equipped to determine the merits of variance applications. *Medical Ctr. v. Princeton Zoning Bd. of Adjustment,* 343 *N.J.Super.* 177, 198, 778 *A.*2d 482 (App.Div.2001) (citing *Ward v. Scott,* 16 *N.J.* 16, 23, 105 *A.*2d 851 (1954) and *Hawrylo v. Board of Adjustment, Harding Tp.,* 249 *N.J.Super.* 568, 578, 592 *A.*2d 1236 (App.Div.1991)).

Courts will interfere with such local decisions only if they are arbitrary, unreasonable or capricious, *Kramer v. Board of Adjustment, Sea Girt,* 45 *N.J.* 268, 296, 212 *A.*2d 153 (1965), or if they are violative of statutory guidelines. *Burbridge v. Mine Hill Tp.,* 117 *N.J.* 376, 385, 568 *A.*2d 527 (1990). A local board's action is presumed valid, and the challenger has the burden of proving otherwise. *New York SMSA Ltd. P'ship v. Board of Adjustment, Bernards Tp.,* 324 *N.J.Super.* 149, 163, 734 *A.*2d 817 (App.Div.), *certif. denied,* 162 *N.J.* 488, 744 *A.*2d 1210 (1999). The law presumes that local boards will act fairly, with proper motives, and for valid reasons. *Kramer, supra,* 45 *N.J.* at 296, 212 *A.*2d 153.

Fundamentally, a reviewing court may not substitute its judgment for that of local officials. *Ibid.* So long as substantial evidence exists to support the local action, a court may not interfere. *Ibid.* It is not the role of a reviewing court to determine whether the decision of a local board was wise or unwise. *Kaufmann v. Planning Bd., Warren Tp.,* 110 *N.J.* 551, 558, 542 *A.*2d 457 (1988).

A local board's denial of a variance is entitled to greater judicial deference than a decision to grant a variance. *Northeast Towers, Inc. v. Zoning Bd. of Adjustment, Borough of West Paterson,* 327 *N.J.Super.* 476, 494, 744 *A.*2d 190 (App.Div.2000). Thus, a party seeking to overturn the denial of a variance must prove that the evidence before the local board was "overwhelming-

ly in favor of the applicant." *Ibid.* (quoting *Medical Realty v. Board of Adjustment, City of Summit,* 228 *N.J.Super.* 226, 233, 549 *A.*2d 469 (App.Div.1988)).

A nonconforming use which predates the zoning ordinance, such as the VFW gathering hall, is permitted to continue notwithstanding later-adopted zoning regulations which prohibit such a use. *Town of Belleville v. Parrillo's, Inc.,* 83 *N.J.* 309, 315, 416 *A.*2d 388 (1980). However, any significant expansion of a nonconforming use requires a use variance, *N.J.S.A.* 40:55D–70d(2), which requires proof of the positive and negative criteria generally required for all variances. *Fred McDowell, Inc. v. Board of Adjustment, Wall Tp.,* 334 *N.J.Super.* 201, 214, 757 *A.*2d 822 (App.Div.2000), *certif. denied,* 167 *N.J.* 88, 769 *A.*2d 1051 (2001).

The expansion of nonconforming uses is disfavored. *Urban v. Planning Bd., Borough of Manasquan,* 124 *N.J.* 651, 656, 592 *A.*2d 240 (1991). Because of the disfavored status of nonconforming uses, the Legislature has determined that the favorable vote of a simple majority of a local board is not sufficient to approve their establishment or expansion. *N.J.S.A.* 40:55D–70d. Thus, in this case, by law, the vote of four in favor and three against the VFW variance did not result in approval. Five affirmative votes are required for approval. *Ibid.*

Before recounting relevant portions of the memorializing resolution, we note that the issues involved here are relatively straightforward. The proposed use is the placement of a fifty-two ton army tank on the front lawn of a property in the municipality's highest residential zone and in the municipality's Historic District. The only viable special reason that is proffered is that its placement at the VFW property will promote the general welfare and that the site, because it is already owned by the VFW, is particularly suitable for it. The negative criteria, *i.e.,* whether allowing the proposed use will not cause substantial detriment to the public good and will not substantially impair the intent and purpose of

the zone plan and zoning ordinance, is guided by the extent of any undesirable visual impact and any adverse impact on the historic district. The facts are not complicated. The tank is there for all to see, in its proposed location, in relation to the surrounding neighborhood. In this factual complex, there is no need for detailed factual findings.

We set forth in their entirety two points of the resolution which furnish the Board's findings and conclusions regarding the positive and negative criteria:

4. *The applicant has failed to establish the positive criteria for the grant of a(d)(2) variance.* Applicant argues that the proposed use, the development of the front yard with a memorial including the use of a tank is an inherently beneficial use serving the public good. Applicant points to the federal incorporation of the VFW, and its public service purposes in honoring those citizen[ ]s who have served the nation in our military in support of this view. Admittedly this use promotes the "general welfare of the community". The VFW use, however, while promoting the "general welfare", does not carry with it the "inherently" beneficial mantra allowing the use to exist regardless of the site's suitability that other "inherently" [beneficial] uses such as schools, public housing, hospitals, seeing eye dog facilities, and sewerage treatment plants possess. See: *Medici v. BPR Co.,* 107 *N.J.* 1, 12–15, 526 *A.2d* 109 (1987). Promotion of the "general welfare" by a fraternal organization like the VFW does not create by itself an "inherently beneficial" use in a zoning context absent any peculiar relation between such activities and the nature and location of the specific piece of property. *Skaf v. Zoning Bd. of Adjustment of Asbury Park,* 35 *N.J.Super.* 215, 223–224, 113 *A.2d* 843 (App.Div.1955); *Cooper v. Maplewood Club,* 43 *N.J.* 495, 504–505, 205 *A.2d* 736 (1964). Here the Board finds that the proposed memorial is not an inherently beneficial use which may be located anywhere without regard to the suitability of the site proposed for its use. If the use is to be allowed applicant must demonstrate and the Board must find that the use promotes the general welfare because the proposed site is particularly suited for the proposed use. *Medici v. BPR. Co., supra,* at 4, 526 A.2d 109; *Stop & Shop v. Bd. of Adjustment,* 162 *N.J.* 418, 431, 744 A.2d 1169 (2000). Here such proofs do not exist in the record.

The VFW owns the ground upon which it hopes to construct the memorial. It also owns the structure located on ground adjacent to the proposed location of the memorial. These appear to be the only facts which make the site's location appropriate for the contemplated use. Unlike the findings in *Anfuso,* however, where a waterfront location in a residential area was found to be particular[ly] well suited for a marina given the surrounding uses and the proposed use's need for a waterfront location, *Anfuso v. Seeley,* 243 *N.J.Super.* 349, 371–373, 579 A.2d 817 (App.Div.1990), there is nothing about the nature of the proposed memorial site which makes it any more suited for the memorial than other permitted uses in the district. *Degnan v. Monetti,* 210 *N.J.Super.* 174, 185, 509 A.2d 277 (App.Div.1986); *Pagano v. Zoning Bd. of Adjustment,* 257 *N.J.Super.* 382, 608 A.2d 469 (Law

Div.1992); *Funeral Home Mgnt. v. Basralian,* 319 *N.J.Super.* 200, 212, 725 *A.2d* 64 (App.Div.1999). Further there is no proof in the record that other locations in the community, such as its public parks, redevelopment areas near the river, or the sites of existing monuments are not equally as appropriate for the memorial as the VFW site. The applicant has simply not proven that the site was particularly suited for the memorial or that other suitable sites in the City were unavailable. In the absence of such proof the applicant has failed to establish the "positive criteria" for the variance.

5. *The applicant has failed to establish the "negative" criteria for the (d)(2) variance.* To obtain a use variance, applicant must establish in addition to the "positive" criteria the so called "negative" criteria set forth in *N.J.S.A.* 40:55D-70. This criteria requires that the applicant show that the variance can be granted without a "substantial detriment to the public good" and that its grant will not "substantially impair the intent and the purpose of the zone plan or zoning ordinance". "Substantially" is determined by balancing the zoning benefits arising from a grant of the variance against the zoning harms to determine on balance whether the harms [are] substantial. *Yahnel v. Bd. of Adjust. of Jamesburg,* 79 *N.J.Super.* 509, 519, 192 *A.2d* 177 (App.Div.), *cert. den.,* 41 *N.J.* 116, 195 *A.2d* 15 (1963). In determining "detriment to the public good" the focus is on the variance's effect on surrounding properties. *Medici v. BPR Co., supra,* n. 12. Here, the property and area [a]ffected is within the City's historic district. The Board has an analysis of the memorial's impact on the surrounding properties contained in a May 13, 1999 report prepared by Edward Fox, an architect and planner employed by the City's Historic Commission. This report found that the memorial as proposed "would have an adverse impact on the architectural and landscape architectural character for the individual property for which it is proposed, as well as the adjacent properties along the Riverbank Drive." The Board adopts the factual findings which support this conclusion. Numerous witnesses owning property in the vicinity of the VFW site testified on the harm which the proposed memorial would have on their residential property values and the potential for future investment in the district. These observations are supported by Mr. Fox's report.[6] While a memorial which is far less intrusive might avoid the concerns raised on balance the Board concludes that the memorial has a significant adverse impact on the area of concern justifying the Board's finding that its placement at the proposed location would represent a "significant detriment to the public good".

The applicant must also demonstrate that the variance grant will not "substantially impair the intent and the purpose of the zone plan or zoning ordinance." The Board notes that VFW post already exists in the area of concern; this element of the negative criteria are viewed with greater liberality because their expansion are less likely to involve substantial impairment of the zoning plan than applications

___

[6] The record contains no testimony about adverse impact on property values or future investment. This finding, therefore is not supported by the record. This defect is not sufficient to vitiate the balance of the Board's findings and conclusions.

which inject a totally new use into the zone. *Kingwood v. Board of Adjustment,* 272 *N.J.Super.* 498, 640 *A.*2d 356 (Law Div.1993); *Alpine Tower v. Mayor & Council,* 231 *N.J.Super.* 239, 555 *A.*2d 657 (App.Div.1989); *Grundlehner v. Dangler,* 29 *N.J.* 256, 148 *A.*2d 806 (1959). That being said the present application is not merely an expansion of the existing building which would have minimum impacts on the zoning district in which existing it is located. Here, the nature of the proposed memorial creates a problem with the goals and objectives of the historic district in which it is located. As noted in the Fox report: "(t)he tank memorial as it is proposed in the application is anachronistic and disruptive to Burlington City's historic Nineteenth Century riverfront architectural character and is incompatible in terms of setback, height, massing, and other key historic streetscape elements regulated by the ordinance." It constitutes an intrusion into the historic district adversely [a]ffecting the compatibility of the site on which the memorial is to be built with the goals and objectives of the District. It also operates to intrude upon adjacent and nearby properties to disrupt the continuity of the District. The impact of the proposed use on the historic district is set forth in detail within the Fox report which is adopted by reference into this finding. On balance it is found to be "substantial". While a different memorial with less of an impact or designed in such a way as to be more in keeping with the neighborhood or the same memorial in a different location might not run afoul of this criteria, as and where proposed the use "substantially impair(s) the intent and the purpose of the zone plan or zoning ordinance" for the area in which it is to be placed. The Board concludes therefore that neither element of the negative criteria are satisfied by the applicant's proofs.

The resolution states that the Board considered the reports and testimony of Fox, Scangarello and Shuster. Among the three experts, the Board obviously relied most heavily on Fox. The members were entitled to credit Fox's opinion and that of the City's Historic Preservation Commission, which he represents. We have carefully reviewed the record. All three judges on this panel have personally visited and viewed the site with counsel's permission. We cannot say that the decision of the three members opposed to the variance, as expressed in their resolution, was unsupported by the record or was in any way arbitrary, capricious or unreasonable. We have no basis to substitute our judgment for theirs.

Reversed.

WEFING, J.A.D., concurring.

In the procedural context of this case, I agree with my colleagues' conclusion that the trial judge should not have taken the

case away from the Burlington City Planning Board and decided the matter himself. In my judgment, the failure by the members of the Board to engage in any discussion or deliberation prior to casting their votes on December 19, 2001, was cured by the Board's consideration of the VFW's application for reconsideration on March 27, 2002.