**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3164-19T2

11 MT. PLEASANT JV, LLC,

     Plaintiff-Respondent,

v.

LAND USE PLANNING BOARD
OF THE TOWNSHIP OF EAST
HANOVER,

     Defendant-Appellant,

and

TOWNSHIP OF EAST HANOVER,

     Defendant-Respondent.

_____

          Argued October 14, 2020 – Decided December 14, 2020

          Before Judges Fisher, Gilson and Gummer.

          On appeal from Superior Court of New Jersey,
          Law Division, Morris County, Docket No. L-1361-19.

          William J. Rush argued the cause for appellant.

Karl P. Kemm argued the cause for respondent 11 Mt. Pleasant JV, LLC (McManimon, Scotland & Baumann, LLC, attorneys; Karl P. Kemm, of counsel and on the brief; Joshua V. Berliner, on the brief).

Gregory F. Kotchick argued the cause for respondent Township of East Hanover (Durkin & Durkin, LLC, attorneys; M. Murphy Durkin, on the brief).

PER CURIAM

Defendant Land Use Planning Board of the Township of East Hanover appeals from the trial court's order reversing the Board's denial of the site plan approval application submitted by plaintiff 11 Mt. Pleasant JV, LLC.[1]  Because we agree with the trial court's findings that the Board's decision was arbitrary, capricious, and unreasonable and that remand to the Board would be futile, we affirm.

Plaintiff owns 11 Mt. Pleasant Avenue, Block 99, Lot 4, in East Hanover Township.  The property was part of the site of a manufacturing facility operated and subsequently abandoned by the Varityper Corporation.  Vacant since 1997, the structures on the property were demolished, leaving remnants of parking lots and building foundations.  In 2003 the Township Council adopted a resolution authorizing the Board to investigate whether the Varityper site and surrounding

---

[1]  Defendant Township of East Hanover did not file an appeal but submitted a brief in support of the Board's appeal.

properties qualified as an "area in need of redevelopment" under the New Jersey Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -89.

After conducting a public hearing on the results of its investigation, the Board in 2004 adopted a resolution recommending that the Township Council designate a portion of the studied property as an area in need of redevelopment. The Township Council adopted a resolution to that effect later that year but rejected an initial draft redevelopment plan due to concerns about traffic, density, impervious coverage, and impact on the neighborhood, which includes a high school. An advisory committee of local residents and business owners was created to explore alternatives, and a request for alternative redevelopment concepts was issued to the general development community. The committee reviewed the four submitted concept plans, and a new draft redevelopment plan was issued in 2006. Later that year the Township adopted that redevelopment plan by enacting Ordinance No. 22-2006, which amended its code and zoning map to designate thirty-seven acres of land as the Varityper Redevelopment Area (VRA).[2]

---

[2] The VRA contains Lots 4, 4.02, and 5.01 in Block 99 of East Hanover. The Varityper plant was located on Lot 4, which encompasses more than twenty-five acres owned by plaintiff. Lot 4.02 is approximately eleven acres of forested land. Lot 5.01 consists of .64 acres and contains a partially constructed car wash facility.

The initial redevelopment plan did not permit warehouse or warehouse-type uses. Before purchasing the property, in November 2017 plaintiff's predecessor entity Penford Group, LLC met with members of the Township's staff, the Board's chairman, and Township and Board professionals to discuss amending the redevelopment plan to permit the warehouse Penford intended to construct on the property. A draft revised redevelopment plan, which included as a permitted principal use "[w]holesale and warehouse storage facilities and wholesale distribution centers," was issued. The Board reviewed the draft revised redevelopment plan, confirmed that it included the Board's recommendations, suggested no changes, and referred it to the governing body. The Mayor and Township Council reviewed the recommendations of the Township Planner and determined that it was in the Township's best interests to adopt the revised plan. On March 5, 2018, the Township enacted Ordinance No. 1-2018 and adopted the revised plan.

A draft second revised redevelopment plan was subsequently issued. The Mayor and Township Council reviewed the recommendations of the Township Planner and determined that the second revised plan was in the Township's best interests. With the enactment of Ordinance No. 7-2018 on June 4, 2018, the

Township adopted the second revised and final redevelopment plan (the Varityper Redevelopment Plan or VRP).

Like the prior plan, the VRP included as a permitted principal use "wholesale, warehouse storage and distribution facilities and wholesale distribution centers." The VRP addressed off-site improvements in sections 6.6 and 8.5. Section 6.6 provided:

> The designated redeveloper(s) within the Redevelopment Area will be responsible for their pro-rata share of any installation or upgrade of infrastructure related to their project whether on-site or off-site including improvements to the Route 10/ Mount Pleasant Avenue/New Murray Road intersection . . . The extent of the redeveloper's responsibility will be outlined in the redeveloper's agreement with the Township. Off-site responsibility for properties not covered under the redeveloper's agreement will be determined during the permit and/or site plan review phases.
>
> [(Emphasis added.)]

Section 8.5 provided:

> The designated redeveloper(s) shall be responsible for any installation or upgrade of infrastructure related to their project whether on-site or off-site. Infrastructure items include, but are not limited to gas, electric, water, sanitary and storm sewers, telecommunications, recreation or open space, streets, curbs, sidewalks, street lighting and street trees or other improvements. The extent of the designated redeveloper's

> responsibility will be outlined in the redeveloper's agreements with the Township.
>
> [(Emphasis added.)]

That language tracks similar or identical provisions contained in the original redevelopment plan and the revised redevelopment plan. Thus, from the very beginning of its planned redevelopment of the VRA, the Township, with input from the Board, determined that a redeveloper's obligations regarding off-site improvements would be set forth in the Township's agreement with the redeveloper.

On August 6, 2018, the Township Council adopted Resolution 116-2018, naming Penford as the redeveloper of Lot 4 in the VRA. On September 5, 2018, the Township and Penford entered into a Redevelopment Agreement. Penford subsequently assigned that agreement to plaintiff. In the agreement, the parties acknowledged that the redeveloper intended to redevelop the property to contain "an approximately 322,219 square foot warehouse and related amenities." Section 4.02 of the agreement, entitled "Redeveloper's Obligations," provides:

> (d)    Off-Site Improvements and Contribution. Redeveloper shall be solely responsible for the cost of extending and/or providing any and all utilities required to service the Property and/or the Project. The Parties recognize and agree that the scope and/or cost of other off-site improvements, including but not limited to traffic control devices, traffic control measures,

6

roadway widening and related road/traffic measures improvements (the "Off-Site Improvements") cannot be determined at this time. The Parties have agreed that the Redeveloper shall make a contribution for Off-Site Improvements which shall be in the amount of Three Hundred Eighty Five Thousand Dollars ($385,000.00) (the "Off-Site Contribution"). . . . The Township shall not be restricted in its use of the Off-Site Contribution and is free to use the Off-Site Contribution in any manner it sees fit. The provisions of this section shall be in full and complete satisfaction of any off-site improvement requirements in the Redevelopment Plan, the Municipal Land Use Law and/or any applicable Township ordinances or regulation, and the same shall be conclusive on these matters and binding upon the Township Planning Board and Township Engineer.

[(Emphasis added.)][3]

Plaintiff filed an application with the Board for site plan approval to construct a warehouse on the property. The Board conducted hearings regarding the application on March 5, 2019, and April 8, 2019. Plaintiff presented sworn testimony from its site engineer, architect, traffic engineer, professional planner, and facility manager. No other expert witnesses appeared.

---

[3] During oral argument before the trial court, Board counsel asserted that the Board was not bound by the Redeveloper's Agreement "other than the fact that it was for the amount of money." In fact, the governing body expressly bound the Board to the entirety of that provision, including that the agreed-upon payment constituted "full and complete satisfaction of any off-site improvement requirements" in the VRP.

7

Based on comments from the superintendent of the neighboring high school and at the request of the Board during the March 5, 2019 hearing, plaintiff amended its application to close a driveway leading to one intersection so that trucks would exit on another road and to rotate the warehouse so that its loading bays would no longer face the school. That change required relief from the VRP's prohibition against front-yard loading areas. The revised application otherwise complied with the requirements of the VRP except that it did not have an irrigation system for plantings or pedestrian accessibility and walkways in the truck parking court.[4]

During the hearings, the Board's chairman and vice chairman[5] repeatedly rendered opinions as if they were expert witnesses and made conclusive statements as if they were fact witnesses testifying under oath. They were neither.

During the March 5, 2019 hearing, the vice chairman expressed his concerns about the project causing water to enter his basement: "I live behind

---

[4] In its resolution, the Board did not address the three requested variances before it. During oral argument before the trial court, Board counsel conceded that the parties did not "need to worry about any of the other minor variances . . . . The issue is traffic." We accept that concession.

[5] The vice chairman's behavior during the April 8, 2019 meeting prompted another Board member to ask him to "[c]alm down."

there. I've lived there for over 40 years and I don't want to have any water in my basement. How am I . . . going to prevent water coming onto that . . . development behind there?" After plaintiff's site engineer testified that plaintiff's plan reduced the amount of coverage, the vice chairman responded:

> [VICE CHAIRMAN]: You may think you are. Okay?
>
> [PLAINTIFF'S SITE ENGINEER]: Well, yeah, we are.
>
> [VICE CHAIRMAN]: I have lived there for over 40 years and I know what goes on there.

The vice chairman proceeded to make statements about the creation of a stormwater retention basin when his development was built.

> [VICE CHAIRMAN]: So it lets my development be dry. How, you're adding all of that back into that stream –
>
> [PLAINTIFF'S SITE ENGINEER]: No.
>
> [VICE CHAIRMAN]: You can shake your head as much as you want. I live there. Okay?

The vice chairman finally acknowledged that he was not an expert and stated that he would "leave that up to our engineer." The Board's engineer did not express any concern.

The vice chairman also opined, contrary to plaintiff's landscape architect, that plaintiff would be ripping out tree roots, causing trees to die. He complained that he had seen "demolition equipment on site already." When plaintiff's lawyer advised him that environmental testing and remediation was taking place on site, the vice chairman appeared to question that assertion and fault plaintiff for believing prematurely that the Board would approve its application.

He rendered conclusions regarding traffic conditions, citing the length of his residence in the Township: "I've lived in town 45 years and I couldn't get across that 40 years ago and I can't get across it now," "[n]o cars will get across that intersection. You'll have one tractor-trailer sitting there, and that's it," and "I've lived here 45 years. I don't want any trucks coming out of there."

He opined about snowplowing:

> I don't know anybody that plows snow that would want to plow it around a corner, because what they're gonna do, they're just gonna push it to the outside perimeter on every side.
>
> . . . .
>
> They're not going to go around corners with it. They're going to look for the first edge to push it to and that's where it's gonna go. So I don't know how you're saying that it's going to go on the end of those 70 trailers parked and put snow there. The only snow that's going to wind

up there is the snow that's right in front of them, probably block them in . . . .

And he opined about truck-turn radii:

> That's a three-lane road coming down Mt. Pleasant Avenue. And the lane on the extreme right, the light is always green. So with your large trucks coming down, they're going to have to swing out into the other lane to make the turn. . . .
>
>     . . . .
>
> . . . [Y]ou're going to have to make one hell of a turn going in there because he's going to be jumping the curb every time.  And with a little snow and a little ice on the ground you've -- you've got a hazardous condition there.

He made conclusions about efforts to enforce traffic signs:  "[y]ou can't enforce either one."  He nevertheless demanded that plaintiff hire a Township police officer to monitor truckers' turns:  "As long as you're open, a cop has got to be there.  If you're open 24 hours a day, seven days a week, you've got to have a cop there.  You want the site, you've got to make a choice."  He opined about the behavior of truckers:  "They're not gonna want to do that. . . If I . . . had a truck and I'm leaving that site, I'm not gonna sit in that intersection for five or ten minutes.  I'd rather drive for ten minutes than sit in traffic."

The Board chairman acknowledged the Township's long-time problem with a particular intersection:

11

It's a shame because this intersection has been like this 50 years. Every town in Morris County has grown, businesses have grown, and the State has just not done a damn thing to help us. And it's a shame that we have an Applicant here now and we're trying to ask this Applicant to fix all problems of the world with that intersection.

Contrary to the testimony of the only traffic engineering expert who had appeared at the hearings, the Board chairman opined plaintiff was "exacerbating" the problem with the intersection, stated "we can't have trucks going into that intersection," and asserted, although plaintiff now indicated it intended to have a twenty-four hour, seven-day-a-week operation, a representation had been made at an initial concept meeting that plaintiff would not have a "24-7 operation."

The chairman opined about the off-site contribution provision for which the Township had contracted in the Redeveloper's Agreement:

CHAIRMAN []: You know as well as I do that that contribution isn't going to do diddly squat to fix that intersection.

[PLAINTIFF'S ATTORNEY]: With all due respect, Mr. Chairman –

CHAIRMAN []: We'll let a judge decide that then.

12

The chairman's and vice chairman's opinions and assertions impacted the comments of others. For example, the vice chairman opined that "trucks are going to be running night and day" because over-the-road truck drivers "eat and they sleep and they live in those things." That comment prompted the school superintendent[6] to express concern about security and speculate that truckers who sleep overnight would come onto school grounds. When she asked plaintiff's site engineer if it takes longer to start a diesel truck, the Board chairman responded: "[i]n the winter typically they keep them running." That response led the school superintendent to express concern that the exhaust could create a health issue.

At the April 8, 2019 hearing, after plaintiff's last witness had testified and the last member of the public had commented, the Board did not engage in any discussion or deliberation.[7] Instead, the chairman asked for a motion and the

---

[6] During oral argument before the trial court, Board counsel misspoke when he told the court that "there was testimony from the school superintendent." In fact, the superintendent was not placed under oath. See N.J.S.A. 40:55D-10(d) (requiring that "testimony of all witnesses relating to an application for development [] be taken under oath . . .").

[7] We recognize that discussion among board members is not required. Scully-Bozarth Post v. Planning Bd., 362 N.J. Super. 296, 312 (App. Div. 2003), and that ultimately it is in its resolution that a board provides its statutorily-required findings of fact and conclusions of law, New York SMSA, L.P. v. Bd. of

A-3164-19T2

vice chairman moved to deny plaintiff's application "based on the traffic." The Board denied plaintiff's application in a five to four vote.[8]

The Board adopted a written resolution memorializing that decision on June 25, 2019, over a month after the deadline imposed in N.J.S.A. 40:55D-10(g). In its resolution, the Board stated that it had determined that plaintiff's site plan "did not support the required goal objectives of the [VRP] primarily to improve access and traffic flow on the surrounding roadways."

In its findings of fact, the Board included, among other things: (i) the chairman's opinions that the $385,000 off-site contribution "does not come remotely close to addressing the off-site traffic problem"[9] and that plaintiff in its previous meetings with the Township had not represented accurately that the

---

Adjustment of Twp. of Weehawken, 370 N.J. Super. 319, 334 (App. Div. 2004). But, when a board relies in its resolution on discussions that did not take place on the record, as the Board did here, see supra at 17, the board highlights the arbitrary and capricious nature of its decision.

[8] One Board member asked if he could "vote in a different direction with stipulations" and if he could "make a motion to approve it with stipulations." He was told that he had to vote on the vice chairman's motion first and that he could not make a motion until the vice chairman's motion was decided.

[9] During oral argument Board counsel represented to the trial court that chairman's view of the amount of money "didn't render in the decision." In fact, it was included as one of the Board's factual findings and referenced repeatedly in the Board's resolution.

facility would be open seven days a week and twenty-four hours a day; (ii) the vice chairman's assumptions about the number of tractor trailers that could be on-site; (iii) the school superintendent's concern about exhaust from idling trucks, which she expressed after the chairman and vice chairman stated that truckers run trucks continuously; (iv) a board member's opinion, based on his experience as a truck driver and working with truck drivers,[10] that independent truck drivers would not follow a traffic plan for access to a highway; and (v) the unsworn beliefs and factual assertions about traffic and trucker behavior made by co-owners, one of whom previously had attempted to purchase plaintiff's property, of an adjacent commercial lot containing warehouses that would be in competition with plaintiff's proposed warehouse.[11]

The Board faulted plaintiff for not providing testimony as to how the Township would use the $385,000 off-site contribution and how it would help

---

[10] The Board references this expertise in its resolution. Even assuming it was appropriate to treat a board member as an expert witness and to consider his unsworn comments as expert testimony– and it wasn't – the record contains only a vague statement that he has "been involved in this type of business for a long time." Moreover, "because [a board member's] remarks represent informal verbalizations of the speaker's transitory thoughts, they cannot be equated to deliberative findings of fact." New York SMSA, 370 N.J. Super. at 334.

[11] The Board states in its resolution that one of those co-owners "has been involved in the trucking business and has worked with truck drivers his entire adult life." No such statement appears in the transcript.

A-3164-19T2

alleviate existing traffic problems. With no contrary expert testimony presented, the Board found not credible plaintiff's traffic engineer's testimony about plaintiff's proposed efforts to direct truck traffic. The Board also found that plaintiff's planning expert was not credible because plaintiff's application "does not address the most essential purpose[] of the [VRP]."

The Board in its resolution commented repeatedly on the chairman's unsworn assertion that plaintiff had misrepresented its hours of operation in its negotiations with the Township regarding the Redevelopment Agreement.

> Upon discussion among the Board, the Board concluded that the Applicant was not forthright in its representations to the Township when negotiating the Redevelopment Agreement and misrepresented the hours of operation and that the business would be opened 7 days a week. The Board further concluded that had the Township been provided the correct and accurate information the Township would not have designated the applicant as Redeveloper.
>
> . . . .
>
> The Board also found the Applicant's misrepresentation of its hours and type of operation to Township while negotiating the Redeveloper's Agreement to be compelling and doubted that the applicant would have been designated a redeveloper had the Applicant provided the correct and accurate information. The Board took umbrage in the fact that the Applicant had provided conflicting information to the Township, which led to the Board questioning the credibility and

16

the validity of the Applicant's representations before the Board.

The transcript of the Board's two hearings on this application do not contain that discussion, leading us to conclude that it did not actually take place. Moreover, the chairman's unsworn and unsupported statements regarding alleged discussions concerning plaintiff's hours of operation do not establish that misstatements were made and do not have the effect of rescinding the Redeveloper's Agreement.

The Board stated in its resolution that it had determined that (i) plaintiff's site plan "did not support the required goal objectives of the [VRP]"; (ii) plaintiff "provided incorrect and misleading information to the Township during the negotiation of the Redevelopment Agreement designation as a redeveloper"; (iii) plaintiff's "designation as a redeveloper was made under false pretenses"; and (iv) plaintiff's site plan "and use sought impairs the intent, purpose and objectives of the [VRP]." Yet, the record does not reflect that any of those determinations were actually made by the Board.

Plaintiff filed a complaint in lieu of prerogative writs, seeking, among other things, a judgment that the Board's denial was arbitrary, capricious, and unreasonable; a reversal of the Board's decision; approval of plaintiff's revised application as submitted; and a direction that the Township accept any and all

17

plans reflecting plaintiff's revised application, as long as they meet applicable building codes, and issue appropriate permits. The Board and the Township filed answers.

After considering the record before him and conducting a hearing, Judge William J. McGovern III issued a lengthy and thorough written opinion, finding that (i) the Township is bound by the Redeveloper's Agreement; (ii) the Board had no authority to disregard the provisions of the Redeveloper's Agreement or to impose additional conditions beyond those set forth in the Redeveloper's Agreement, including conditions regarding off-site traffic improvements; (iii) the Board did not have jurisdiction to deny the application based on off-site traffic conditions or improvements, other than requiring approval from other governmental agencies; (iv) the Board's decision was arbitrary, capricious, and unreasonable; and (v) a remand would be futile given the Board's "clear and patent hostility." We agree and affirm.

Land-use decisions generally "are entrusted to the sound discretion of the municipal boards . . . ." Kaufmann v. Planning Bd. for Warren, 110 N.J. 551, 558 (1988). Our deference to local boards "is predicated on the existence of adequate evidence in the record supporting the board's determination . . ." Lang v. Zoning Bd. of Adjustment, 160 N.J. 41, 58 (1999). We review de novo a

18

board's conclusions of law. Reich v. Borough of Fort Lee Zoning Bd. of Adjustment, 414 N.J. Super. 483, 499 (App. Div. 2010).

A party challenging a board's decision must establish that the board's action was arbitrary, unreasonable, or capricious. Price v. Himeji, LLC, 214 N.J. 263, 284 (2013). "A board acts arbitrarily, capriciously, or unreasonably if its findings of fact . . . are not supported by the record or it usurps power reserved to the municipal governing body or another duly authorized municipal official." Ten Stary Dom P'ship v. Mauro, 216 N.J. 16, 34 (2013).

The Board attempted to usurp the Township's power when it denied plaintiff's application "based on the traffic." The planning board in Dunkin' Donuts of New Jersey, Inc. v. North Brunswick Planning Board, 193 N.J. Super. 513, 514 (App. Div. 1984), similarly denied the application before it "solely upon the anticipated impact of the proposed use on traffic congestion and safety." As we found in Dunkin' Donuts, a planning board is "without authority to deny site plan approval because of off-site traffic conditions." Id. at 515.

> A planning board should consider off-site traffic flow and safety in reviewing proposals for vehicular ingress to and egress from a site, N.J.S.A. 40:55D-7, 41(b). Pursuant to ordinance it may condition site plan approval upon a contribution to necessary off-site street improvements. N.J.S.A. 40:55D-42. But the authority to prohibit or limit uses generating traffic into already congested streets or streets with a high rate of accidents

is an exercise of a zoning power vested in the municipal governing body. N.J.S.A. 40:55D-2, 62.

[Ibid.]

See also Cox & Koenig, New Jersey Zoning and Land Use Administration, § 23-9 (2020) ("[P]lanning board has no authority to deny a site plan because of its anticipated detrimental impact on off-tract conditions. Planning for traffic patterns is an exercise of the zoning power vested in the governing body.").

In addition to misapplying the law,[12] the Board also misinterpreted or selectively read the clear and unambiguous language of the VRP and the Redeveloper's Agreement. Since 2003, the Township has been working on what could be done to make this abandoned industrial site useful to the community. After consideration of input from local residents and business owners, the Board, and other professionals and experts and after review and adoption of other plans, the Township ultimately enacted an ordinance by which it adopted the final VRP. Knowing about the longstanding local traffic issues, the Township nevertheless included in the VRP as a permitted principal use "wholesale, warehouse storage and distribution facilities and wholesale

---

[12] We find unpersuasive arguments based on cases that pre-date the enactment of the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -163 (MLUL), or that involve illegal quid pro quo payments, an allegation that no one has made against the Township.

distribution centers," which is plaintiff's intended use. The Township in the VRP expressly addresses the treatment of off-site improvements, requiring a redeveloper to be responsible not for the entirety of the improvements, but for its "pro-rata share of any installation or upgrade of infrastructure." The Township, in two different places in the VRP, stated that the "extent" of the "redeveloper's responsibility will be outlined in the redeveloper's agreement with the Township." The Township in the Redeveloper's Agreement contracted that plaintiff would contribute $385,000 "in full and complete satisfaction of any off-site improvements in the Redevelopment Plan, the [MLUL] and/or any applicable Township ordinances or regulation." The Township specified in the Redeveloper's Agreement that the Board would be bound by that provision.

Disregarding that clear language, the Board instead focused on one of the plan goals[13] – "[t]o improve access and traffic flow on surrounding roadways" – and language in the VRP recognizing that the VRP advances five objectives of East Hanover's Master Plan, including "[i]mprov[ing] the level of service along the Route 10 corridor through the implementation of creative engineering, land

---

[13]  In its resolution, the Board referenced this goal as "the most important" goal of the VRP. That designation is not made in the VRP; instead, the traffic issue is listed as one of six goals.

use and design techniques" and "[i]mprov[ing] the function of problem intersections."[14] The Board also focused on one sentence in the VRP: "[i]mprovement of this intersection beyond what existed at the time of the adoption of this Redevelopment Plan is essential." Citing those provisions, the Board then criticized plaintiff for failing to prove how its project would improve the intersection or provide testimony as to how the Township would allocate its contribution.[15]

Nothing in the VRP invests the Board with the authority to determine what plaintiff must do to improve the intersection or how plaintiff must contribute

---

[14] In its resolution, the Board mischaracterizes these provisions as a "stated objective" of the VRP. In fact, they were two of five objectives of the Master Plan, which the Township believed the VRP advanced.

[15] We find unpersuasive the Board's arguments regarding plaintiff's Environmental Impact Statement (EIS) and failure to include a level of service analysis in its EIS pursuant to section 6.4K2 of the VRP. We note that the vice chairman's motion to deny the application was not based on an incompleteness of the application, which could have been cured before the hearing, but was "based on the traffic." Rather than supporting its denial, the Board's argument that the absence of a level of service analysis somehow prevented it from determining if the off-site contribution promoted the goals of the VRP or how it would upgrade infrastructure demonstrates the Board's effort to seize authority it did not have. The Township in the VRP provided that the redeveloper's responsibility for its pro-rata share of off-site improvements would be set forth in the Redeveloper's Agreement and in that Agreement the Township provided that the Township, not plaintiff and not the Board, would use the contribution "in any manner it sees fit."

towards that improvement. That authority rests squarely with the Township, which adopted a plan that allowed for a warehouse storage and distribution facility as a permitted principal use, required a redeveloper to contribute its pro-rata share to off-site improvements, and stated that the extent of the redeveloper's responsibility would be set forth in a Redeveloper's Agreement, an agreement in which the Township established $385,000 as the contribution "in full and complete satisfaction of any off-site improvements in the Redevelopment Plan." To accept the Board's denial of plaintiff's application "based on the traffic" from plaintiff's permitted principal use and on the chairman's rejection of the contracted contribution amount of $385,000 as "diddly squat" would have the effect of enabling the Board to rewrite the VRP and rescind the Redeveloper's Agreement, authority the Board does not have.

Many of the Board's findings of fact were not supported by the record. Hearings conducted by a municipal board "to decide an application for a land use approval are quasi-judicial proceedings." Central 25, LLC v. Zoning Bd. of Union Cty., 460 N.J. Super. 446, 464 (App. Div. 2019). Local boards must make factual determinations and decide issues of credibility in proceedings that include general procedural safeguards "not unlike (but not as extensive as) those controlling judicial proceedings." Baghdikian v. Bd. of Adjustment of Ramsey,

247 N.J. Super. 45, 49 (App. Div. 1991). Board proceedings "must be governed by a spirit of impartiality uninfluenced by considerations [outside] the record." Hill Homeowners Ass'n v. Zoning Bd. of Adjustment of City of Passaic, 129 N.J. Super. 170, 179 (Law Div. 1974), aff'd, 134 N.J. Super. 107 (App. Div. 1975). Regrettably, those safeguards and that spirit were absent from the Board's proceedings on plaintiff's application.

Perhaps the most fundamental safeguard of the integrity of our proceedings is the requirement that a witness swear or affirm to tell the truth before testifying. See N.J.R.E. 603 ("[b]efore testifying a witness shall be required to take an oath or make an affirmation or declaration to tell the truth under the penalty provided by law"); N.J.S.A. 40:55D-10(d) (requiring that "testimony of all witnesses relating to an application for development [] be taken under oath . . ."). The "oath or affirmation required of a witness . . . constitutes a strong reminder that he has a special obligation to testify truthfully and that he is subject to punishment should he fabricate." State v. Caraballo, 330 N.J. Super. 545, 555 (App. Div. 2000). It is not "an empty gesture." Ibid. A witness who refuses to take an oath or make an affirmation "should not be allowed to testify." Ibid.

The transcript of the Board's proceedings establishes that many of the individuals on whose "testimony" the Board purports to base its decision were not placed under oath. That critical omission is not simply a factor in determining the credibility of a witness but goes to the core of whether a person's statements meet the basic threshold of trustworthiness that enables a judicial or quasi-judicial body to consider them. Because the Board improperly premised many of its factual findings on unsworn commentary, those findings are not supported by the record and cannot be the basis of the Board's denial of plaintiff's application.

In addition to his conclusion that the Board's decision was arbitrary, capricious, and unreasonable, we also agree with Judge McGovern's decision not to remand the case. When a court is convinced that "reasonable efforts" to obtain board approval would be a "fruitless waste of time," the court's "appropriate resolution is not a remand, but an order directing approval . . . " Sprint Spectrum, L.P. v. Borough of Upper Saddle River Zoning Bd. of Adjustment, 352 N.J. Super. 575, 615-16 (App. Div. 2002). See also New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield Bd. of Adjustment, 160 N.J. 1, 16-17 (1999).

A-3164-19T2

Judge McGovern aptly summarized the basis for his decision not to remand:

> The comments made by at least two (2) members of the Board reflect not only suspicion of the [plaintiff], but hostility to [plaintiff] targeted for the most part on the inability of [plaintiff] to provide as part and parcel of its site plan application, a magic pill to cure all of the Township's ills and ailments that concern traffic congestion on Route 10.

A board may "bring to bear in its deliberations the general knowledge of the local conditions and experiences of its individual members." Baghdikian, 247 N.J. Super. at 50. For example, a board may consider "a member's personal knowledge of a site condition gleaned from that member's daily drive by the site on his or her way to work." Ibid. The chairman's and vice chairman's unsworn factual statements and opinions on a wide range of subjects go well beyond that standard. The Board's adoption of their commentary and the unsworn statements of others as fact, its assumption of authority it did not have, and its attempt to rewrite or rescind the VRP and the Redeveloper's Agreement convince us that any remand would be futile.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3164-19T2